Driver vs. Maxwell.

---

MOSES DRIVER, plaintiff in error, vs. WILLIAM A. MAXWELL, administrator, defendant in error.

1. If, in the affidavit to obtain a distress warrant, a definite sum is claimed to be due for rent, the time when it became due need not appear, nor need the terms of the rent contract be set out, such as that the rent agreed upon was a part of the crop, etc. If these facts become material in any stage of the litigation, they may be proved, and it will be no variance.

2. In this state, the burthen of keeping the premises in repair is generally on the landlord, but patent defects existing at the time of the renting, and equal-

Driver *vs.* Maxwell.

ly well known to both parties, are not to be amended by him, or at his expense, without a special undertaking. On the other hand, the tenant is not obliged to amend them without a like undertaking on his part.

3. Where the rent reserved is one-third of the corn and one-fourth of the cotton raised on the premises in the given year, and at the time of the renting both parties know the fence to be in a very bad condition, too low or too weak to keep ordinary stock from trespassing on the crop, and nothing is said about building it higher or repairing it, there is no legal obligation upon either party to make the fence better. The crop is at the mutual risk of the landlord and tenant, each to the extent of his interest, and whatever part of it may be destroyed by stock in consequence of the fence not being good, is a common loss. The landlord is entitled to his proportion of what is saved but to nothing for what is lost, and so of the tenant.

JACKSON, Judge, dissenting:

1. If the verdict of the jury be right under the evidence, this court should not set it aside, though there may be errors in the charge of the court.

2. This oft-repeated rule of this court should be more rigidly adhered to where the case against the plaintiff in error is made out by the testimony of an impartial witness, and his case supported only by his own evidence.

3. The fact that plaintiff in error made no motion for a new trial in the court below, but brought the case here directly on alleged errors in the charge, ought further to strengthen the application of this wise rule.

4. Whilst, by a strict construction of section 2284 of the Code, it is the duty of the landlord to keep in repair even the fencing around the farm rented, yet he is not bound to watch the fence and see that it is kept up. That duty devolves on the tenant, who may repair himself and charge the landlord with it, to be accounted for in the rent, or notify the landlord that the fencing needs the repair.

5. If both parties know that the fencing is defective at the time the farm is rented, the contract is made with reference to its condition at that time; unless there be an express contract therefor, the landlord is bound to put it in no better condition; the tenant will be held to rent with his eyes open, and will be bound for the whole rent agreed to be paid, no matter how defective the fence was and what depredations hogs or cattle or storm or sickness made upon it.

6. If the tenant see his crop destroyed by cattle without either fixing the fence himself or notifying the landlord to do it, he neglects a plain duty, which both common sense and the law of self-preservation, as well as the sensible construction of the law of the land, impose upon him, and he and not the landlord should suffer for such gross neglect.

7. When the only proof for the tenant, he himself being the only witness, is injury to his crop in its gathering, arising from sickness of those who gather it, storms in wasting it, and cattle and hogs who prey upon it, and he furnishes no *data* on which it is possible for a jury to predicate a conclusion in respect to how much injury the crop sustained by the breaking in through

Driver *vs.* Maxwell.

a defective fence, of the cattle and hogs and the proof of the landlord is that of a disinterested witness, fully sustaining the verdict of the jury, the verdict should stand for these, if all the other reasons given be untenable.

Landlord and tenant. Distress warrant. Pleadings. Before Judge CLARK. Sumter Superior Court. October Adjourned Term, 1874.

For the facts, see the opinions.

JOHN R. WORRILL, for plaintiffs in error.

C. F. CRISP; N. A. SMITH, for defendant.

BLECKLEY, Judge.

1. The affidavit for distress warrant was for a definite sum alleged to be due for rent, but did not disclose when it became due, or set forth the terms of the rent contract. The plaintiff gave evidence of a contract, not payable in money, but in a part of the crop—one-third of the corn and one-fourth of the cotton to be raised on the premises in the year 1873. With this and some other evidence, a part of it tending to prove the quantity and value of the corn and cotton raised, the plaintiff closed; and the defendant thereupon moved for a non-suit, because it was not averred in the affidavit that the sum distrained for was due, and because there was a variance between the testimony and the facts alleged in the affidavit. The affidavit showed substantially that the amount claimed was due. It failed to show when it became due, but that is not required. Neither is it necessary to set forth the rent contract. What is required is laid down in section 4082 of the Code, and this affidavit conformed to all the provisions of that section. Whatever of detail was relevant in any stage of subsequent litigation, was admissible evidence without other or fuller pleading than the affidavit as it was. All that "any person who may have rent due," is required to swear, in order to obtain a distress warrant, is prescribed; and whoever goes that far is entitled to prove the actual facts of his

case when he is met and resisted with an issue. The motion for a non-suit was properly overruled.

2. The Code, section 2284, introduced a new rule on the subject of keeping rented premises in repair, devolving the burden on the landlord instead of upon the tenant, where it rested by the rule of the common law. This statutory obligation of the landlord has been frequently considered by this court; 48 *Georgia Reports,* 172; 49 *Ibid.,* 272; 38 *Ibid.,* 542; 39 *Ibid.,* 210; *Whittle vs. Webster,* 55 *Ibid.,* 180. Generally, no doubt, where full rent is reserved, the landlord is to be understood as letting his property in a condition reasonably fit for the purpose for which it is intended to be used, and as binding himself to keep it in that condition, on proper notice from his tenant, by making necessary repairs, or authorizing them to be made at his expense. But where the premises, by reason of patent defects, known alike to both parties, are, at the time they are offered for rent, out of repair and unfit for safe or comfortable use, the tenant ought to reject them if he is not satisfied to accept them as they are; and if he does accept them, no matter what price he agrees to pay, the landlord, in the absence of a special undertaking to do more, should be held for such repairs only as become requisite to keep the property in as good condition as when it was rented. He may well say to the tenant, "you knew what you got; I offered my property as it was, and did not hold it out to you for more than it was." In such a transaction all the conditions of fair dealing would be met and satisfied. On the other hand, however ruinous and dilapidated the property might be, the tenant, without some special undertaking on his part, no matter at how cheap a rent he was admitted into possession, would be under no legal obligation to make any repairs or to call for any; certainly he would be under no duty to his landlord to make or call for any which the latter knew were needed at the time of entering into the rent contract. Surely the tenant would be at legal and moral liberty to remain quiet so long as the premises were in as good a condition as when he received them. That much was

his privilege under the old rule of law, when he himself had to make repairs. He was bound for such repairs only as were requisite to maintain the *status quo ;* in some cases, perhaps, not for that much.

3. If these views are correct, their application to the present case is not difficult. The contract of renting was made with the tenant by an agent of the landlord. It was for one year, 1873, and the landlord's compensation was to be one-third of the corn and one-fourth of the cotton raised on the premises. It is not shown to have been in writing—the presumption is it was in parol. The agent of the landlord testifies that the fence was in very bad condition, insufficient to turn and keep off ordinary stock from destroying the crop; that plaintiff and defendant both knew it at the time of the renting, and that nothing was said as to who should put the fence in condition to protect the crop. The tenant testifies that nothing was said as to who was to put the fence in condition to protect the crop; that all the parties knew the fence was no account, and would not turn any kind of stock; and that in many places a man could step over it with ease. In relation to the crop made, its value, and what became of it, the agent testifies, that the corn raised was something like one hundred and thirty or one hundred and forty or one hundred and fifty bushels, worth $1 00 per bushel; and the cotton something like three or four bales; that good cotton was worth some thirteen cents per pound, but this was very poor, because the tenant and his hands, being sick in the fall, did not gather the crops till late, and the storms and the stock injured them very much. The tenant testifies that he raised about four bales of cotton, and about one hundred bushels of corn; that about forty bushels of the corn was destroyed by hogs and cattle; that the cattle destroyed all the cotton except two bales, of four hundred pounds each; that the cotton was rather poor, on account of bad weather and the cattle running over it before it was gathered; and that he sold it for eleven cents per pound, which was the best price he could get. He testifies further, that

Driver *vs.* Maxwell.

the rent corn and cotton were to be delivered on the premises; that he put up the rent corn, thirty-three bushels, in a crib, as agreed, and that he tendered to plaintiff's agent one-fourth of the cotton, in the seed, which the agent declined to receive, requiring it to be ginned, baled and delivered in Americus. It does not appear what finally became of the corn put up as rent. The presumption is that the cotton tendered in the seed was afterwards ginned, and formed a part of the two bales sold.

On the facts in evidence there was no legal obligation upon either party to make the fence better. Both knew of its condition, and neither stipulated to make repairs or to be chargeable with them. The crop was at the mutual risk of the parties, to the extent of such interest as each had in its preservation. Whatever was lost by reason of the bad fence was as if it had not been produced. Neither party was bound to make the loss good to the other. There is no evidence that the fence deteriorated or became in a worse condition than when the parties contracted. Its then insufficiency continued, and there is no evidence of any fault or default on the part of either landlord or tenant. Both parties risked the fence just as they did the soil and the seasons. What the ground would produce and the fence secure they were to divide; what the weather or the cattle destroyed was gone beyond recovery and gave no right to compensation.

The court's charge to the jury was erroneous in so far as it departed from this theory of the law; and inasmuch as the verdict could have been for less than it was, consistently with the evidence, if a correct charge had been given, the judgment is reversed and a new trial granted.

Judgment reversed.

WARNER, Chief Justice, concurred, but furnished no written opinion.

JACKSON, Judge, dissenting.

Tomlinson, as agent for Maxwell, rented certain lands to Driver. At the time of the contract the fences were defective

Driver *vs.* Maxwell.

and both parties knew it.   There was no stipulation that they should be made better, and none devolving the duty to repair upon either.   The rent agreed upon, with a full knowledge of the condition of the fence, was one-third of corn and one-fourth of the cotton *made on the place.*

The plaintiff proved that from one hundred and thirty to one hundred and fifty bushels of corn and three or four bales of cotton were raised on the place; that corn was worth one dollar per bushel and cotton thirteen cents per pound.   This proof was by Tomlinson, who had no interest in the case.

The defendant proved by himself that he raised on the place four bales of cotton and one hundred bushels of corn ; that about forty bushels of corn was destroyed by the hogs and cows; that the cattle destroyed all the cotton except two light bales weighing four hundred pounds each ; that on account of bad weather and the cattle running over the cotton before it was gathered, it was rather poor, and he had sold both bales at eleven cents per pound ; that defendant measured plaintiff his full portion of corn due according to said contract and put it in a crib to itself, and also cotton fully one-fourth, and put it to itself; that the corn actually measured and cribbed for plaintiff, was thirty-three bushels ; that storms came, and the place was very sickly and the weather bad, and hogs and cattle trespassed on the crop and prevented its proper gathering.   The court charged the jury and they found for plaintiff $99 50.

I think that the jury found right.   I have doubt that they believed the defendant's story.   I doubt that they ought to have believed it.   At one breath he swore that the cattle destroyed all the cotton except two light bales, exactly four hundred pounds each, and these he carried to Americus and got eleven cents a pound for.   In the next breath he swore that he put the landlord's part of the cotton, *fully one-fourth,* he swears, to itself, and kept it for him.   At one breath he swears that he made one hundred bushels of corn, and the cattle eat up forty bushels of it.   At the next, that he cribbed exactly thirty-three bushels for the landlord.   His whole de-

Driver *vs.* Maxwell.

fense is that he was blockhead enough to rent a piece of land so poorly fenced that when he rented it he knew it would not turn cattle or even hogs; and yet when cattle and hogs were depredating upon it, though he thought it was the landlord's duty to repair and keep them out, he suffered the crop to be destroyed rather than notify him or his agent.

I repeat that I cannot find it in my heart to condemn the jury for the verdict they rendered. It seems to have been moderate; it was only $99 50. The proof fully authorized it, and I think it should stand, though the court may have erred upon questions of law, as this court has ruled so often that if I undertook to enumerate the cases it would spin this opinion into a yarn unendurably long. Especially, when no motion is made for a new trial, should this oft-repeated rule be adhered to, and still more should it prevail in a case where no human being—no neighbor, no son, no employee—witnessed the destruction wrought upon this man's crops by the storm and the sickness, the hogs and the cattle, except himself! And when even he, who can pack two light bales of cotton with so much accuracy that neither of them shall weigh more than just exactly four hundred pounds, cannot or does not tell the jury how much of the crop was destroyed by each of these calamities—sickness, storms and cattle! It would require wonderful skill in ciphering to determine from the premises given by his testimony exactly how much corn and how much cotton each of these causes of ill luck produced, unless, indeed, it be the law that the landlord shall warrant not only a good fence but no sickness and no storms. How any jury could cipher out an approximation to a proper deduction to be made from the landlord's rent from these cattle, damage *feasant*, all mixed with the sickness and storm in uncertain proportions, I cannot imagine, and if it be demanded that they shall apportion such damage between landlord and tenant, the beginning would surpass the skill of Kepler or Sir Isaac Newton. I shrink from putting such a task upon a jury, and for this reason I dissent from the judgment of the court.

Driver *vs.* Maxwell.

But has any substantial error been committed by the court below? Let us see. Two errors are assigned : first, his refusal to charge as requested; secondly, the charge given. He was requested to charge as follows: "That in making the contract of rental between plaintiff and defendant, if nothing was said about necessary repairs, and who should keep the premises in suitable repair for cropping in said year 1873, for which said contract was made, the plaintiff should have kept said premises in repair, and if the crops, or a portion of the same, was destroyed by cows and hogs, for want of proper repairs done on the fence around said premises, that plaintiff could not recover if the amount destroyed was equal to what his portion of the crops would have been."

This request would announce the law, that the landlord, without notice, must see to it that the fence around the place he rents is good and kept good all the year. I do not understand that my brethren hold this extreme view. If pronounced law, it would unsettle all the ideas the profession entertain of it, and would plunge the relation of landlord and tenant into as much confusion and difficulty as a jury would encounter in settling the contest for supremacy between storm and sickness and cattle, without any *data* being furnished to show which did the most damage. The landlord may live a hundred miles off. It makes no difference. He must move in the neighborhood of the place he rents, or hire somebody to go around it all the year, every week or two. It has always been thought heretofore to be the duty of the cropper to take care of his crop, and as the easiest way of doing it to go round his fence occasionally and mend the rails which break or rot, and put up the fence if storms have blown it down or hunters have left it down.

But the second error alleged against the court below is the charge he did give. What is that? It is "that if defendant rented land from plaintiff with a bad fence around the premises at the time of renting, and a large portion of the crop was destroyed by hogs and cows by reason of said defective fence, yet defendant was liable to pay full rent for the prem-

ises unless there was an express contract at the time of rental that plaintiff was to repair the fence; that plaintiff was not required to keep the fences in repair if the fences were not in repair at the time of renting; that if defendant failed, for any cause, to gather the crops in proper time, and the same were injured and damaged, that defendant was still liable to pay plaintiff rent for the amount of corn and cotton made on the place." This charge, when we look at it in connection with the request which preceded it, and when we analyze it, means this: that when the fence is defective when the farm is rented, and the tenant sees it and knows the defect, he makes his bargain in reference to its then condition; he agrees to pay so much rent for it as it stands, and the landlord is only bound, on notice, to keep it as good as it was; he should have notice if it gets worse, and if, as in the case at bar, the tenant fail to give any notice or to keep the fence in the condition it was, and for any cause, by cattle or storm or sickness he fail to gather it, he still must pay rent for what he makes. His contract is to pay one-fourth and one-third of cotton and corn he makes. To make, means to gather and house; to fit it for use or market. If after he lays by the crop, for want of keeping up the fence himself and charging the landlord for it, or for want of notice to the landlord; if for this neglect of a most reasonable duty on his part, the crop is lost or destroyed in whole or in part, he should still pay the rent. And such I take to be the meaning of the statute, (Code, sec. 2284.) It makes him liable to keep the premises in repair. What repair? The repair they were in when he rented them. Who will know if they get out of repair? The tenant, because he occupies and uses them. How shall the landlord know? By notice from the tenant; he is absent, he can know in no other way. It is no hardship on the tenant to notify him; it is a hardship on him to visit the tenement or farm and pry out leakages or deficient fences. There is no evidence in this record that this tenant ever notified the landlord when this fence got worse, if it did. It is probable that it did get so from the wind and storm and the natural

Driver *vs.* Maxwell.

decay. No damage is complained of till the gathering of the crop, and the storms poured and the winds blew and the sickness came about that time, and the fences fell then, most probably because of the storms, and were not repaired because of the sickness. This construction accords, too, with the decisions of this court, that notice must be given by the tenant in such a case, or he must repair and charge the landlord and take it out of the rent. The duty is on the landlord to keep in repair, but the duty is on the tenant to inform him when it is needed. It was so decided in *Vason vs. City of Augusta*, 38 *Georgia Reports*, 542, and again held in *Whittle vs. Webster*, 55 *Georgia Reports*, 180. In the latter case the chief justice said what I say here: "If a tenant should rent a dilapidated or leakey store-house, with full knowledge of its actual condition, at a reduced price in consequence thereof, and puts his goods therein, and the same are damaged, he would not then have any legal or just cause of complaint against his landlord." And again, he said, "and, if after the premises have been rented, the same become unfit by reason of the roof of the house becoming leaky, or other similar cause, so as to render the house unsuited for the purpose for which it was rented, the landlord is bound, *upon notice being given to him of the defect by the tenant*, to make the necessary repairs within a reasonable time thereafter, and upon his failure to do so, and damage results to the tenant's goods in consequence of such failure to make the necessary repairs, the landlord will be liable therefor."

In this opinion Judge BLECKLEY and myself concurred. I adhere to it, *the tenant must give notice to the landlord to repair*. The rule, just everywhere, is the more expedient in the farming operations of our people.

It becomes all important in cases of this sort not to extend or expand the rule one *iota* in favor of the tenant. As a practical question, it pervades the state and its great agricultural interests every where; and it is all-important, in my judgment, so to construe the act as to require the tenant to notice his fences and tell the landlord that they need repair,

or hold him responsible for his neglect. For these reasons I dissent from the judgment of this court, and would affirm that of the court below.